IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| MELINDA PAIGE, | ) | CASE NO. 1:21-143 |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | MAGISTRATE JUDGE |
|  | ) | JONATHAN D. GREENBERG |
|  | ) |  |
| COMMISSIONER OF SOCIAL | ) |  |
| SECURITY, | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Melinda Paige ("Plaintiff" or "Paige"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I. PROCEDURAL HISTORY

On August 8, 2018, Paige filed an application for SSI, alleging a disability onset date of January 13, 2013, later amended to August 8, 2018, and claiming she was disabled due to attention deficit hyperactivity disorder, "aphasia alexia dysgraphia," anxiety, lichen planopilaris, speech problem, and depression. Transcript ("Tr.") at 15, 171, 192, 197. The application was denied initially and upon reconsideration, and Paige requested a hearing before an administrative law judge ("ALJ"). Tr. 117.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On January 14, 2020 an ALJ held a hearing, during which Paige, represented by counsel, and an impartial vocational expert ("VE") testified. Tr. 31-54. On February 11, 2020, the ALJ issued a written decision finding that Paige was not disabled. Tr. 15-24. The ALJ's decision became final on December 2, 2020, when the Appeals Council declined further review. Tr. 1-3.

On January 19, 2021, Paige filed her Complaint to challenge the Commissioner's final decision. Doc. No. 1. The parties have completed briefing in this case. Doc. Nos. 14, 16. Paige asserts the following assignments of error:

> (1) Whether the administrative law judge erred in failing to determine that the plaintiff suffered from severe physical impairments, in particular bilateral knee osteoarthritis and seropositive rheumatoid arthritis.
>
> (2) Whether substantial evidence support further limitations than what was determined by the administrative law judge in her residual functional capacity assessment.

Doc. No. 14, p. 1.

## II. EVIDENCE

### A.    Personal and Vocational Evidence

Paige as born in 1968 and was 50 years-old on the date the application was filed. Tr. 30. She has a limited education and no past relevant work. Tr. 23.

### B.    Relevant Medical Evidence[2]

### 1. Physical impairments

On June 1, 2018, Paige saw Dr. Dana Angelini complaining of fatigue. Tr. 739. She had a history of mild neutropenia since 2009 and reported feeling fatigued with low energy, she had started losing some hair, she had generalized weakness, and experienced dizziness. Tr. 739. Her exam findings were normal. Tr. 740. Dr. Angelini noted that a basic blood panel that day was normal and that she had

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

also tested for inflammatory markers, which were unremarkable.  Tr. 741.

On July 14, 2017, Paige visited the pain management clinic for bilateral knee pain described as cramping and aching.  Tr. 284.  She rated her pain 3-5/10 and 8/10, at worst, the prior week.  Tr. 284, 286.  It was worse when she navigated stairs and she felt a sensation of "giving way" when descending.  Tr. 284.  It was hard to do cleaning while being on her knees.  Tr. 284.  She reported not having taken pain medication in the past, she was not on pain medication at that time, she had not tried physical therapy or home exercises, and she had not had injections.  Tr. 284.  Upon exam, she had no swelling, tenderness to palpitations over the medial joint line on the right and tenderness to palpitation of the lateral peripatellar line on the left, full range of motion without pain, full strength, intact sensation, and positive grind testing.  Tr. 287.  She was diagnosed with patellofemoral arthritis, patellofemoral syndrome of both knees, and chronic pain of both knees.  Tr. 287.  X-rays were ordered and she was advised to take over the counter NSAIDs and/or Tylenol and follow up in three months.  Tr. 287.  An x-ray of the left knee showed moderate degenerative disease involving the patella with subchondral cystic changes involving the posterior surface, small joint effusion, and mild degenerative disease of the knee joint.  Tr. 292.  An x-ray of the right knee showed moderate degenerative disease of the patella which demonstrated osteophytes and subchondral cystic changes and small to moderate joint effusion.  Tr. 292.

On June 20 and August 24, 2018, Paige saw her mental health provider, Dr. Stevens, and denied joint pain, back pain, and muscle pain; upon exam she had a normal gait.  Tr. 737, 957.

On January 3, 2019, Paige saw Dr. Amir Khan for her 3-month follow-up appointment in internal medicine.  Tr. 1052, 1056.  The treatment note states that Paige had a longstanding complaint of chronic fatigue and that extensive workups had been done and were normal.  Tr. 1052.  She continued to see a psychiatrist for anxiety, depression, and ADHD and was treated with medication.  Tr. 1052.  Her dermatologist had prescribed medication for her lichen planus.  Tr. 1052.  She reported generalized body

3

aches and pain in her muscles and joints; her knee pain and stiffness were the most chronic.  Tr. 1053. Her pain was worse on her right side since she fell off a chair while attempting to hang a picture two weeks prior.  Tr. 1053.  She had full functionality since then and did not appear to be in pain.  Tr. 1053. Upon exam, she had a normal gait, full range of motion, and intact sensation.  Tr. 1055.  Dr. Khan assessed generalized body aches with an "element of osteoarthritis plus exacerbation after her recent fall," anxiety, recurrent major depressive disorder, and primary osteoarthritis of both knees and referred her to physical therapy.  Tr. 1055-1056.

On February 11, 2019, Paige had a physical therapy evaluation for her neck, back, and bilateral knee pain.  Tr. 1109.  Her pain began as stiffness after her recent fall and then developed into pain, which increased with prolonged positions and weight bearing.  Tr. 1110.  Her functional limitations included the ability to rise from a chair, stand, walk (in the house and in the community), negotiate stairs, bend, perform heavy exertion, and lift.  Tr. 1110.  Upon exam, she had decreased range of motion, strength, and functional mobility.  Tr. 1109, 1111.

On March 29, 2019, Paige saw Dr. Adam Brown for a rheumatological consultation.  Tr. 1187. She complained of body pain which had gotten bad the last three years; she was "forever feeling stiff" and tight throughout her body and sore, especially in her neck.  Tr. 1187.  The feeling lasted throughout the day, it was no different in the morning or afternoon, and her pain got worse if she stood too long.  Tr. 1187.  She felt like her body was swelling but she had no swelling.  Tr. 1187.  She also endorsed severe fatigue.  Tr. 1188.  Upon exam of all her joints she had no swelling or tenderness and good ranges of motion.  Tr. 1192.  Dr. Brown stated that her symptoms were consistent with fibromyalgia (stiffness throughout her body, muscle aches, severe fatigue, depression, anxiety, concentration deficit, and word finding difficulties).  Tr. 1192.  Dr. Brown referred her to physical therapy.  Tr. 1192-1193.

4

On June 3, 2019, Paige had a physical therapy evaluation for her complaints of global pain, stiffness, and fatigue which significantly limited her participation in daily activities.  Tr. 1235.  She presented with impairments of trunk mobility, generalized strength, cardiovascular endurance, and activity tolerance due to her extra-excited nervous system.  Tr. 1235.  She reported being unable to sit more than 20 minutes and being limited in standing, walking, negotiating stairs, bending, physical activities, sleeping, cooking, and cleaning.  Tr. 1236.  Her pain was located in her low back, neck, shoulders, and knees.  Tr. 1236.  Upon exam, her lumbar extension was mildly to moderately limited and her lower extremity strength in her hips and knees ranged from 4 to 4+/5.  Tr. 1237.

On July 5, 2019, at Paige's fifth physical therapy visit, her therapist wrote a progress report.  Tr. 1248.  Paige had good tolerance to the physical therapy and demonstrated objective gains in her mobility, strength, and pain management strategies.  Tr. 1248.  She was progressing slower than expected toward her therapy goals due to her home exercise compliance, pain levels, and objective exam findings, which was "likely associated to her chronic symptoms and overall limited tolerance to activity."  Tr. 1248.  She reported a mild improvement overall and stated that she continued to remain limited in her daily activities and frequently asked her family for help.  Tr. 1249.

On August 6, 2019, Paige saw Dr. Brown for a follow up for her chronic fatigue, pain and anxiety, which Dr. Brown stated were "likely a component of her fibromyalgia."  Tr. 1252.  She reported that her physical therapy helped her "greatly."  Tr. 1252.  Her joint pain improved but she still had hip pain and knee pain.  Tr. 1252.  She described her pain as a deep ache, worse with activity and navigating stairs.  Tr. 1252.  Upon exam, she had hip pain with palpation, the rest of her joints had good range of motion, no tenderness, no swelling, and she had crepitus in her knees.  Tr. 1254.  Dr. Brown assessed her as having a medical history significant for fibromyalgia.  Tr. 1255.

On October 14, 2019, x-rays of Paige's left knee showed narrowing of the medial compartment joint space, osteophytes extending off the posterior patella, and a large osteophyte extending of the lateral femoral condyle.  Tr. 1285.  X-rays of her right knee showed marginal osteophytes extending off the lateral femoral condyle and tibial plateau and osteophytes extending off the posterior patella.  Tr. 1286.  The radiologist's impression was osteoarthrosis, no acute osseous abnormality identified.  Tr. 1285.

On December 3, 2019, Paige saw Dr. Brown, who advised that her rheumatoid factor/CCP antibodies were positive.  Tr. 1319.  Paige had been given a prednisone taper and stated, "I could walk again! I felt great!"  Tr. 1319.  Upon exam, she had a good range of motion in all joints and no tenderness or effusion.  Tr. 1321.  Dr. Brown changed his diagnosis to seropositive rheumatoid arthritis prescribed methotrexate therapy.  Tr. 1321.

### 2. Mental impairments

On July 12, 2016, Paige saw Dr. John Kuruvilla for a neuropsychological evaluation.  Tr. 262-263.  She reported a history of memory problems for the past two years: losing track of directions, forgetting her keys and purse, not remembering what she read, not recalling directions, and leaving the stove on.  Tr. 265.  She reported two recent head injuries from rear-end vehicle collisions and having had "cognitive dysfunction for some time."  Tr. 265.  She had a history of depression and anxiety for which she had recently started treatment and felt better.  Tr. 265.  Dr. Kuruvilla concluded that it was likely that her cognitive dysfunction "may be related more to her depression and anxiety rather than due to any structural abnormalities of the brain" and that it was possible that she has an underlying learning disability or attention deficit that may be making her symptoms worse.  Tr. 266.  He stated that his evaluation demonstrated that she had evidence of cognitive impairments in various domains including attention/ processing speed, language and naming, executive functioning, visuoconstruction ability, and

aspects of memory, and that the results "were suggestive of a fairly diffuse cognitive impairment and appear to represent a decline from the patient's baseline level of functioning."  Tr. 263.

On January 24, 2018, Paige saw Dr. Mirica Stevens for a follow up for her depression and anxiety.[3]  Tr. 369.  She reported that she continued to have problems with her focus and comprehension; when she tried to read something she couldn't understand what she just read and she would also drift off.  Tr. 369.  Upon exam, her speech was clear, her language normal, her associations intact, her thought process was circumstantial and her thought progression was normal, her fund of knowledge was appropriate, she was oriented, her memory was intact, her concentration was scattered and variable, and her mood was euthymic and her affect full.  Tr. 370.  Dr. Stevens listed her diagnoses: anxiety disorder panic disorder without agoraphobia, social phobia, generalized anxiety disorder, mood disorder dysthymic disorder, and ADHD, and adjusted her medications.  Tr. 371.

On June 20, 2018, Paige returned to Dr. Stevens for medication management.  Tr. 737.  She had no complaints, her exam findings were unremarkable (normal speech, language, concentration, mood, affect, and intact memory), and her medications were continued.  Tr. 737-738.

On June 26, 2018, Paige had a Speech Language Evaluation with Jonathan Plessner, MA, CCC-SLP at the request of her counselor to determine her functional communication needs and to rule out aphasia.  Tr. 840.  Paige reported a car accident with head trauma 10-15 years ago but she was unsure whether that caused her current complaints.  Tr. 840.  She was independent with most activities of daily living but received help from her children as needed, including grocery shopping (she preferred not to leave her home to shop) and she had a difficult time with math, which she found embarrassing and it was difficult to manage her finances.  Tr. 840.  She was able to drive.  Tr. 840.  It had been a while since she had worked and she had difficulty keeping a job, which she suspected was caused by her depression,

---

[3] Later records refer to this provider as Dr. Stevens and Dr. Sanders.  *See, e.g.*, Tr. 737-738.  For convenience, the Court will refer to this provider as Dr. Stevens.

anxiety, and reduced communication skills.  Tr. 840.  She completed 11 years of school but did not graduate; she was interested in pursuing a GED but was not sure she could complete the coursework. Tr. 840.  She did not participate in many social activities or maintain social relationships because of her communication difficulties.  Tr. 840.  Her testing results showed none, mild or moderate results (*e.g.* her voice and speech production were within functional limits, she had a very mild disorder in receptive language, a mild disorder in fluency secondary to aphasia, and a moderate disorder in expressive language, reading comprehension, and written expression) and her intelligibility score in known context was >99% and her intelligibility in unknown context was 96%.  Tr. 841.  Plessner diagnosed aphasia secondary to her cognitive disorder and possibly due to her history of brain injury, characterized by her difficulty with word finding, reduced fluency and grammar skills, and "difficulty understanding and formulating complex verbal/written information alongside the need for additional processing time and frequent paraphasias."  Tr. 841-842.

On July 26, 2018, Paige saw Kathleen Miller, LSW, for counseling.  Tr. 868.  Miller was a new counselor for Paige and Miller worked on developing a relationship with her.  Tr. 868.  Miller stated that she worked on breaking down complex information for Paige and asking "repeatedly if she understood what was being communicated."  Tr. 868.  Paige reported that she was confused about her appointments and she struggled with hearing and comprehending information at times, asked a lot of questions, and made numerous pauses as she talked.  Tr. 869.

On August 9, 2018, Paige saw Miller and struggled to find her words and was frustrated by not being able to maintain a smooth conversational flow and her low confidence in her abilities to communicate.  Tr. 867.  On August 23, Paige reported an inability to get her thoughts down on paper to send a letter to her son and felt frustrated as a result.  Tr. 864-865.

On August 24, 2018, Paige followed up with Dr. Stevens and was upset that Dr. Stevens would not sign an order for continued speech therapy; Dr. Stevens advised that as she had not referred her she was not the proper person to sign the order.  Tr. 957.  Paige expressed being upset that she could not get an earlier appointment and had to wait until Dr. Steven's first available appointment.  Tr. 957.  Paige expressed being upset that Dr. Stevens had not referred her to a new counselor despite getting a letter advising that Paige's prior counselor had left.  Tr. 957.  Paige was also upset because Dr. Stevens did not understand that she wanted a letter from Dr. Stevens for Paige to bring to court stating that a recent legal issue "was due to her 'mental illness.'"  Tr. 957.  Dr. Stevens challenged Paige to develop some insight into her projecting and her unrealistic expectations.  Tr. 957.  Paige reported using more than her prescribed Ativan to drive her car, which she is not to permitted to take while driving, and Dr. Stevens advised that she could no longer prescribe that medication knowing that Paige is using it while driving.  Tr. 957.  Paige also gave a note to Dr. Stevens stating, "son graduating from the army on the 18th and will need assistance getting on the plane."  Tr. 958.  Upon exam, Paige had clear and distinct speech, normal language, intact associations, a circumstantial thought process, adequate fund of knowledge, intact memory, normal mood and affect, and variable concentration.  Tr. 958.  Dr. Stevens discontinued her Ativan due to improper usage but gave her 5 pills to cover the dates of her son's upcoming graduation.  Tr. 958.

On August 30, 2018, Paige left a telephone message for Miller to call her as she was still upset about last doctor visit.  Tr. 863.  She was concerned that her doctor had changed her medications; she feared that she could not express herself well to the doctor and felt that the doctor was accusing her of taking her medications incorrectly.  Tr. 863.  After talking to Miller, Paige agreed to see how she did without that medication for a few weeks as it is something she takes as needed and she doesn't take it very often.  Tr. 863.

9

On September 4, 2018, speech-language pathologist Tracy Biller completed a questionnaire on Paige's behalf.  Tr. 837.  She listed Paige's diagnoses—aphasia and cognitive-linguistic deficits—and opined that Paige would have difficulty with multistep directions, her ability to maintain attention fluctuated and depended on her anxiety level, she would take longer than expected to process information, and communication deficits limited her socialization with others.  Tr. 835.  Regarding how Paige would respond to pressure in a work setting involving simple, routine, or repetitive tasks, Biller stated that she suspected that Paige would have difficulty due to her reports of anxiety and taking longer than expected to process information and complete tasks secondary to her aphasia.  Tr. 835.

At her three speech therapy visits with Biller in September 2018, Paige did not bring her home practice sheets.  Tr. 1042-1043.  On September 5, she stated that she was struggling to write her name; she didn't think it "looked right" but it was correct.  Tr. 1042.  At a counseling session with Miller on September 6, Paige struggled to maintain her focus and worked on having a smooth conversation flow; she also reported having taken a sleep aid the night before which was making it hard for her to function that morning.  Tr. 861.  On September 20, Paige reported issues with her three younger sons to Miller and how she got through her embarrassment in communicating with their school the week before.  Tr. 858-859.  Miller helped her identify her frustration and work on ways to communicate her frustration in an effective and non-confrontational way with school and the police.  Tr. 858.

On October 1, 2018, Paige saw Biller for speech therapy.  Tr. 1043.  She did not bring her home practice sheets or her email address and password as Biller had asked her to do for the past two weeks so Biller could help her resume email communications.  Tr. 1043.  On October 22, Paige did not bring her email password and was not able to access her account, but she stated that she texted and used Facebook Messenger to communicate with family and friends and that her son would help her with her email password.  Tr. 1044.  Biller gave her compensatory strategies to improve her communication success but

10

Paige expressed reluctance to utilize them.  Tr. 1044.  On October 29, she had not brought her email password and stated that she had decided to focus on texting and using Facebook Messenger to communicate with family and friends.  Tr. 1044.  She read ads and information and answered questions with 100% accuracy.  Tr. 1044.  She stated that she avoids reading in general because her ADHD makes it almost impossible for her to concentrate and she was encouraged to read a small chapter.  Tr. 1045. She was encouraged to return to church, as she had stopped going due to feeling self-conscious about communication deficits and her appearance.  Tr. 1044.   She stated that she might go to a prayer service the next evening but was concerned about her attention span and Biller suggested she try for 20 minutes to start.  Tr. 1045.

On November 12, 2018, Paige reported that she had not gone to church because she was self-conscious about her appearance.  Tr. 1045.  Her reading comprehension for sentences and short paragraphs was 100% accurate and answering questions "only took slightly longer than expected."  Tr. 1045.  Her speech fluency had improved to 85% with fewer pauses and word-retrieval issues and her ability to do math word problems had also improved.  Tr. 1045.  On November 19, Biller stated that Paige was to be discharged from speech therapy on December 17 with the remaining sessions spent focusing on her compensatory strategies to improve her language skills and socialization, which was "currently restricted."  Tr. 1092.

On November 28, 2018, Paige saw Dr. Stevens for medication management.  Tr. 1047.  Dr. Stevens wrote that Paige was often "passively oppositional" to her and desired to be deemed mentally disabled; Dr. Stevens wrote, "To note: patient is able to manage her household independently, be punctual for her appointments, organize her multiple medical appts., etc."  Tr. 1047.  Her exam findings were normal except that her mood was sad.  Tr. 1048.

11

On December 10, 2018, Paige was discharged from speech language therapy because her progress had plateaued.  Tr. 1095.

On February 8, 2019, Paige saw Dr. Stevens and reported that she has been "so so" and that she was sleeping "so so."  Tr. 1104.  She advised that she would be transferring her mental health services to another center because it would be more convenient for her.  Tr. 1104.  Her exam findings were normal except that her concentration was variable.  Tr. 1105.

On February 11, 2019, Paige saw Erin Murphy, APRN, CNP, for a psychiatric evaluation.  Tr. 1124.  She reported having struggled with depression for a long time and anxiety that started a long time ago and was triggered when she didn't take her medication.  Tr. 1124.  She also reported having nightmares, chronic fatigue, and a history of ADHD, which Adderall helped.  Tr. 1124.  Upon exam, she was oriented; withdrawn and calm; she had a flat affect; unremarkable speech, thought content and perception; her thought process was distractable and concrete; she had limited insight and appropriate judgment; and impaired recent and remote memory.  Tr. 1127.  She was resistant to changing her medications and Murphy discussed concerns using Ativan.  Tr. 1127.  Murphy spoke to Dr. Stevens for Paige's history and was informed that neuropsychological testing in April 2014 showed "frontal subcortical dysfunction which can have some long standing effects on development, lability, memory and attention deficits."  Tr. 1127.  Murphy diagnosed severe episode of recurrent major depressive disorder, cognitive communication disorder, generalized anxiety disorder, and ADHD by history.  Tr. 1127-1128.  Paige declined a new medication and Murphy continued her current medications, including not prescribing Ativan.  Tr. 1128.

On March 4, 2019, Paige saw Dr. Sunny Lee in the internal medicine department for cognitive complaints.  Tr. 1158.  She needed help "navigating" and she often felt confused and was tired all the time.  Tr. 1158.  She reported that her treatments so far, including therapy, had not "truly helped."  Tr.

1158.  Upon exam, she had a normal mood, good eye contact, and was pleasant and cooperative.  Tr. 1161.  Dr. Lee assessed pre-diabetes, cognitive complaints, and chronic fatigue and encouraged her to continue with psychiatry, keep her body and mind active, and provided a consult to neuropsychology for an evaluation.  Tr. 1158.

On March 18, 2019, Paige saw Dwayne Reed, R.N., for a follow up for her history of depression.  Tr. 1414.  She described her mood as "pretty good," stated that she was fine, and referenced a recent vague stressor but stated, "I can handle it."  Tr. 1413.  She stated that her status was the same as her prior appointment with Nurse Murphy the month before.  Tr. 1413.  Upon exam she was calm and cooperative, had a blunted affect, good eye contact, unremarkable speech, thought content, thought process, and perception, appropriate insight and judgment, and intact memory.  Tr. 1414.  Reed assessed her as stable.  Tr. 1414.

On April 15, 2019, Paige followed up with Reed and was observed to be dressed neat and clean.  Tr. 1203.  She reported poor but improved concentration on Adderall and problems keeping track of her appointments.  Tr. 1203.  Her exam findings were as her prior visit.   Tr. 1204.  She was assessed as stable and Reed noted that she displayed some issues with concentration.  Tr. 1204.

On May 2, 2019, Paige saw Nurse Murphy for a follow up and reported that her mood was "ok" and her depression and anxiety were stable.  Tr. 1206.  She struggled with motivation, which she believed was due to her recently diagnosed fibromyalgia.  Tr. 1206.  Upon exam, she had a guarded behavior and manner, flat affect, slowed motor activity, good eye contact, concrete thought process, unremarkable speech, thought content and perception, fair insight and appropriate judgment, and intact memory.  Tr. 1207.  Murphy stated that Paige had a little more variable affect and mildly improved engagement but was still withdrawn, which was likely related to a cognitive disorder and personality traits.  Tr. 1207.  Murphy diagnosed recurrent major depressive disorder in partial remission, ADHD,

13

cognitive communication deficits, and anxiety.  Tr. 1207.  Paige was satisfied with her current medication regimen and her medications were continued.  Tr. 1207.

On May 16, 2019, Paige saw her counselor Miller, who reported that Paige engaged slowly, asked questions, and appeared to struggle to formulate her thoughts and needs when discussing significant parenting issues with her sons.  Tr. 1377-1378.  On June 20 Paige was slow to engage but after being directly asked a few questions she became more animated.  Tr. 1382.  On July 11 she was slow to engage and took a long time to address her problems.  Tr. 1384.  On August 28 she was slow to engage but wanted to discuss her recent experience traveling to Alabama to support her cousin after her aunt had passed away.  Tr. 1387-1388.  On September 19 Paige was hard to engage.  Tr. 1392.  She could not verbalize why she needed a case manager and was unable to explain why she was frustrated with her sons.  Tr. 1392.  On October 3 and 17 she was slow to engage and expressed confusion about what her treatment team members' roles were and how best to utilize them (Tr. 1394) and struggled with symptom management.  Tr. 1396.  On October 31 she was more focused and stated that her symptoms were more manageable, she felt more motivated, and she had better functioning, which felt odd to her. Tr. 1407.

On November 20, 2019, Paige saw Deborah Soloman, APRN, CNP, and reported that her new Adderall prescription was working well for her.  Tr. 1311.  Upon exam she had expressive aphasia, talked in a halting manner, and needed time to answer questions.  Tr. 1312.  Her associations were intact, her thought process was logical, coherent and rational, she had unremarkable thought progression, an appropriate and adequate fund of knowledge, good memory, variable concentration, a euthymic mood, and a full and appropriate affect.  Tr. 1312.  Solomon diagnosed anxiety disorder/posttraumatic stress disorder, chronic, and child onset disorder ADHD, predominantly inattentive type.  Tr. 1313.

14

On December 5, 2019, Paige saw Miller, who reported that Paige struggled to remain on topic and identify her feelings and did not appear interested in making statements of thoughts and feelings. Tr. 1404.  Paige stated that she had not been doing much lately or leaving her room much.  Tr. 1404.

**C.     State Agency Reports**

On October 3, 2018, Obiaghanwa Ugbana, M.D., reviewed the record and found that Paige had no severe physical impairments and could perform work at all exertional levels.  Tr. 78-79.  On December 27, 2018, David Knierim, M.D., stated that the agency had been unable to obtain clarifying information regarding Paige's assertion that her "conditions continue to worsen and no other details are offered."  Tr. 93.  The additional medical evidence received did not indicate a severe physical impairment and there was insufficient evidence to support Paige's allegations of worsening.  Tr. 93. Thus, Dr. Knierim affirmed Dr. Obiaghanwa's opinion.  Tr. 93-94.

On October 3, 2018, Robyn Murry-Hoffman, Ph.D., reviewed the record and adopted the prior ALJ's ruling from Paige's previous disability application, finding that Paige was limited to simple, routine tasks with no strict time demands, no strict production quotas, only simple work instructions and decisions, no more than minimal or infrequent changes in the work setting, no direct work-related interaction with the public, and occasional and superficial interactions with coworkers.  Tr. 82, 62.  On December 31, 2018, Carl Tishler, Ph.D., stated that the agency needed additional evidence to assess the severity of Paige's conditions; the agency had attempted to contact Paige numerous times to obtain that information; and Paige had not responded to those attempts.  Tr. 98.  Therefore, Dr. Tishler stated, there was insufficient evidence to find Paige disabled and, after careful review of the additional evidence of record, affirmed Dr. Murry-Hoffman's opinion.  Tr. 98.

**D.     Hearing Testimony**

During the January 14, 2020 hearing, Paige testified to the following:

15

- She attended school through eleventh grade and dropped out due to depression after her mother passed away.  Tr. 36.  She has not tried to get a GED or take classes.  Tr. 36.  She has not had vocational or job training.  Tr. 36.  She last had a job when she was a teenager.  Tr. 37.

- She had four sons; she lives with her 18-year-old twins and another adult son lives next door to her.  Tr. 37.  When asked if she can do housework, she responded, "I get help" and explained that she can't stand up too long because her back hurts or sit too long because she gets stiff.  Tr. 38.  Her knees hurt.  Tr. 38.  She is able to get something to eat by herself— she just gets it, she doesn't cook it—because her twins cook.  Tr. 38-39.  Her sons grocery shop for her because it hurts her to stand in line and walk.  Tr. 39.  She occasionally does laundry and drives.  Tr. 39.  She drives to doctor appointments and will also stop in a store to pick something up "but not actually shop."  Tr. 41.

- When asked how she spends her time during the day, she answered, "I just lay down."  Tr. 39.  She gets something to eat.  Tr. 39.  She lies down in bed the whole day but does not sleep during the day.  Tr. 39.  She has problems sleeping at night.  Tr. 40.  When asked why she lies down all day, she stated that she feels restless, tired, fatigued, "everything is an effort."  Tr. 39-40.  When asked if she had any contact with friends, family or neighbors in person or by telephone or social media she said no.  Tr. 40.  She has a small dog who keeps her company.  Tr. 41.  When asked if she had activities she enjoyed (radio, television, church) she stated that she used to but now she just listens to the radio.  Tr. 40.  She doesn't go to church anymore because the pastor speaks to fast for her to understand.  Tr. 40.  She used to be able to understand him; when asked when the last time she could understand him was, she stated, "I haven't been to church in about five years or more, so."  Tr. 41.

- When asked why she was unable to work, she stated, "I am depressed.  My back hurts.  My shoulder hurts.  I'm super stiff.  I can't stand that long, I can't sit that long."  Tr. 42, 46.  She can sit or stand for about 25-30 minutes before she needs to get up or move around.  Tr. 42.  She can't walk that far; she estimated she can walk about 20-30 minutes before she would have to rest.  Tr. 42.  She can't lift much weight.  Tr. 42-43.  Her pain is a dull feeling and is worse when she tries to overdo it; then, to make it better, she lies down flat and uses heating pads.  Tr. 46.  Her depression symptoms cause her to not want to go anywhere or be bothered.  Tr. 43.  She sometimes talks to her siblings on the telephone.  Tr. 44.

- She used to read but no longer does because she can't follow the plot or she forgets what she read.  Tr. 43.  When asked what other issues were caused by her memory and concentration problems she said that holding a conversation is difficult for her.  Tr. 44.  She has speech issues: her mind goes blank during conversations and she forgets.  Tr. 45.

- She listed her skin problems; she has a scar, alopecia, and keratosis.  Tr. 46.  Her hair loss makes her embarrassed to be around people who knew her when her hair was long; now she keeps it short so you can't see it as much, which she doesn't like.  Tr. 47.

The ALJ asked the VE whether a hypothetical individual with the same age, education and lack of work experience as Paige could perform work if the individual had the following residual functional

16

capacity: a full range of work at all exertional levels, limited to simple, routine tasks with no strict time demands, no strict production quotas, only simple work instructions and decisions, no more than minimal or infrequent changes in the work setting, no direct work-related interaction with the public, and occasional and superficial interaction with co-workers. Tr. 48-49. The VE testified that the hypothetical individual could perform the following representative jobs in the economy: addresser, marker, kitchen helper, and day worker. Tr. 49.

Paige's attorney asked the VE what an employer's customary tolerance for off-task work was and the VE answered that employers generally stick to a 10% rule, which amounts to six minutes an hour for a quick restroom break. Tr. 50. With respect to absences, an employee should average no more than one day per month, and that includes tardiness. Tr. 50.

### III. STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve

17

months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.	The claimant has not engaged in substantial gainful activity since August 8, 2018, the application date (20 CFR 416.971 *et seq*.).

2.	The claimant has the following severe impairments: speech disorder; neurocognitive disorder; depressive disorder; anxiety disorder; attention deficit hyperactivity disorder (ADHD), and borderline intellectual functioning (20 CFR 416.920(c)).

3.	The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.	After careful consideration of the entire record, the undersigned find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple, routine tasks with no strict time demands, no strict production quotas, only simple work instructions and decisions, and no more than minimal or infrequent changes in the work setting. The claimant is further limited to no direct-work-related interaction with the public, and occasional and superficial interaction with co-workers.

5.	The claimant has no past relevant work (20 CFR 416.965).

6.	The claimant was born on May **, 1968 and was 50 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.	The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since August 8, 2018, the date the application was filed (20 CFR 416.920(g)).

Tr. 18-24.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v.Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir.

1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

### A. The ALJ's step two finding is supported by substantial evidence

Paige argues that the ALJ erred at step two when she found that Paige's rheumatoid arthritis and bilateral knee osteoarthritis were not severe impairments.  Doc. No. 14, p. 15.  At step two of the

sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii). To determine if a claimant has a severe impairment, the ALJ must find that an impairment or combination of impairments significantly limits the claimant's physical or mental ability to do "basic work activities." *See* 20 C.F.R. § 416.920(c). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). When an ALJ finds both severe and non-severe impairments at step two and continues with subsequent steps in the sequential evaluation process, error, if any, at step two may not warrant reversal. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is not reversible error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008); *Hedges v. Comm'r of Soc. Sec.*, 725 F. App'x 394, 395 (6th Cir. 2018). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider the limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (emphasis in original, quoting SSR 96-8p).

Here, with respect to Paige's non-severe impairments, the ALJ wrote, in relevant part,

The claimant also suffers from disorders of the skin, rheumatoid arthritis, and obesity. A treatment record dated December 3, 2019 notes that the claimant was newly diagnosed with seropositive rheumatoid arthritis. However, physical exam showed no swelling, tenderness, and she had good range of motion of her joints. Gait was also normal (Exhibit B29F, p. 17) …

\*       \*       \*

The record also includes a diagnosis of fibromyalgia (Exhibit B23F, pp. 25-26)….Here, physical examinations in the record have not documented at least 11 positive tender points and while the claimant does have complaints of fatigue and evidence of depression and anxiety, her treatment records do not indicate repeated manifestations of six or more fibromyalgia symptoms[.] Therefore, the claimant's fibromyalgia does not meet the criteria of Social Security Ruling 12-2p

21

and is not a medically determinable impairment.

Tr. 18-19.

Paige complains that the ALJ did not mention her bilateral knee arthritis or cite x-rays showing arthritis in her knees.  Doc. No. 14, p. 17.  But the ALJ discussed her rheumatoid arthritis; Paige does not show that her knee pain was unrelated such that the ALJ should have treated her knee arthritis as a separate impairment.  Indeed, Paige reported feeling "great" after being treated with a prednisone taper when she was diagnosed with rheumatoid arthritis in December 2019 and was started on methotrexate. Tr. 1319, 1321.  At that visit, as the ALJ observed, Paige had a normal gait, no effusion or tenderness in any of her joints, and a good of motion in all her joints.  Tr. 18, 1321.

Paige argues that she reported knee pain that interfered with her ability to climb stairs in June 2017 and that x-rays in July 2017 showed moderate degenerative disease and small joint effusion.  Doc. No. 14, p. 18.  But at that June 2017 visit she also reported not having been on pain medication, she had not tried physical therapy or home exercises, she had tenderness in her knees but full strength and range of motion upon exam, and the doctor prescribed over-the-counter NSAIDs as needed and home exercises.  Tr. 284, 287-288.  She was to return in three months; it does not appear that Paige followed up.  She did not report knee pain again until 1 ½ years later, in January 2019, when she had a regularly scheduled appointment with her internist and also complained of general body pain after falling off a chair when attempting to hang a painting but reported "full functionality" since then.  Tr. 1053.  In the interim, in June and August 2018, she denied joint pain, back pain, and muscle pain to another provider. Tr. 737, 957.  Neither her complaints of knee pain in 2017 or her x-rays show that her knee impairment significantly limited her ability to do "basic work activities."  20 C.F.R. § 416.920(c); *Higgs*, 880 F.2d at 863 ("[t]he mere diagnosis of arthritis ... says nothing about the severity of the condition").

Paige submits that at her first physical therapy appointment in February 2019 she stated that her

knee pain interfered with her ability to rise from a chair, stand, walk, stair climb, bend, perform heavy exertion, and lift.  Doc. No. 14, p. 18.  But Paige had presented with complaints of neck, back and knee pain and did not distinguish which areas of pain interfered with her ability to perform those tasks.  Tr. 1109-1110.  She rated her pain 0/10, and, upon exam to assess her level of functioning, had a mild to moderately limited range of motion in her cervical and lumbar spine and full range of motion in her knees.  Tr. 1111.  Strength in her shoulders, knees and hips was assessed as 4/5.  Tr. 1111.  At a June 2019 physical therapy evaluation, she complained of "global stiffness and fatigue" and pain in her back, neck, shoulders, and knees; upon exam, her knee strength had improved to 4+/5 while her hip strength remained 4/5.  Tr. 1235.  That evidence does not show that her knee arthritis was a severe impairment that the ALJ should have considered separate from her rheumatoid arthritis.  So, too with respect to her October 2019 knee x-rays showing osteophytes; the impression was osteoarthritis with no acute osseous abnormality identified.  Tr. 1285.  *Higgs*, 880 F.2d at 863 ("[t]he mere diagnosis of [an impairment] ... says nothing about the severity of the condition").

Next, Paige argues that, while her rheumatoid arthritis was a new diagnosis, she had been experiencing pain in her joints, stiffness, and fatigue prior to that diagnosis and since her alleged onset date of August 8, 2018.  Doc. No. 14, pp. 18-19.  With respect to her complaints of fatigue, the ALJ considered her fatigue when evaluating her reported symptoms from her depression.  Tr. 21.  To the extent Paige argues that her fatigue was a symptom of her fibromyalgia, the ALJ found that her diagnosis of fibromyalgia was not supported by the record and, therefore, it is not a medically determinable impairment, a finding that Paige does not challenge.[4]  With respect to her stiffness, Paige first complained of stiffness on January 3, 2019, five months after her alleged onset date, Tr. 1053, and reported joint pain in March and August 2019.  Tr. 1189, 1252; Doc. No. 14, p. 19.  She was diagnosed

---

[4] In her brief, Paige asserts that the ALJ's finding that fibromyalgia was not severe was "in error," but she does not support that assertion with argument or evidence.  Doc. No. 14, p. 18.  Indeed, she concedes that Dr. Brown's change in diagnosis from fibromyalgia to rheumatoid arthritis was "the correct diagnosis."  Doc. No. 14, p. 19.

with rheumatoid arthritis on December 3, 2019, reported feeling great after receiving a steroid taper prior to that date, and was started on methotrexate therapy.  Tr. 1319, 1321.  Thus, Paige does not show that her alleged symptoms from rheumatoid arthritis lasted or is expected to last for a continuous period of at least 12 months.  *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) (citing 20 C.F.R. § 404.1505(a)).  Moreover, there is no opinion evidence in the record setting out functional limitations caused by her stiffness, joint pain, or any physical impairment.  The ALJ relied on the state agency reviewers' opinions, Tr. 22, which Paige does not challenge.  The Court finds that the ALJ's step two finding is supported by substantial evidence.     .

## B. The ALJ's RFC assessment is supported by substantial evidence

Paige argues that the ALJ's RFC assessment did not include "proper limitations" stemming from Paige's speech disorder, neurocognitive disorder, and her ability to concentrate, persist and maintain pace.  Doc. No. 14, p. 19.  In support of her assertion that the ALJ's RFC should have included restrictions to accommodate her speech disorder, Paige relies upon her Speech Language Evaluation.  Doc. No. 14, p. 20.  The ALJ discussed that evaluation, noting that she was found to have a mild disorder in fluency secondary to aphasia, a moderate disorder in expressive language, a very mild disorder in receptive language, and a moderate disorder in reading comprehension and written expression, and her intelligibility score in known context was >99% and 96% in unknown context due to aphasia.  Tr. 22.  Paige does not explain how her scores amounted to more limitations than the ALJ assessed.

Paige submits that the ALJ should have included limitations of speaking to coworkers and supervisors, speaking on the job, and having written and spoken directions repeated.  Doc. No. 14, p. 21.  But the ALJ limited Paige's speaking when she found that Paige could have no direct work-related interaction with the public and occasional and superficial interaction with co-workers.  Paige does not

show how those limitations are insufficient to address her speech disorder.  The ALJ also limited her to simple, routine tasks, which is consistent with Paige's evaluation indicating that she would have difficulty understanding and formulating complex verbal/written information (Tr. 842) and her speech therapist's opinion that she would have difficulty with multi-step directions (Tr. 835).

Paige complains that the ALJ "should have included more specific limitations with respect to her ability to maintain concentration, persistence and maintain pace."  Doc. No. 14, p. 21.  She asserts that Dr. Kuruvilla's July 2017 neuropsychological evaluation found that she had a cognitive impairment in the domain of attention/processing speed and aspects of memory.  But Dr. Kuruvilla also stated that she "was generally able to retain what she had initially learned" and that it was likely that her cognitive disorder "may be related more to her depression and anxiety rather than due to any structural abnormalities of the brain."  Tr. 266.  The ALJ found that Paige's depression and anxiety were stable, a finding that Paige does not challenge.  She complains that the ALJ "gloss[ed] over" Dr. Kuruvilla's testing but does not show how the testing performed by Dr. Kuruvilla yielded greater limitations than the ALJ found.  She points out that Dr. Kuruvilla stated that her exam results "appear to represent a decline from [her] baseline level of functioning" but it is not evident what Dr. Kuruvilla based that statement upon, nor does it describe functional limitations or show that Paige would be off-task more than 10% of the workday, as she alleges.  Doc. No. 14, p 22.  In short, Dr. Kuruvilla did not assess functional limitations regarding Paige's ability to concentrate, persist and maintain pace; his evaluation is not evidence that Paige had more severe limitations than the ALJ assessed.  The state agency reviewers did assess Paige's functional limitations and the ALJ relied upon them, a finding that Paige does not challenge.

Finally, Paige cites evidence in the record in which she complained of difficulty with concentration, attention and focus and cites exam findings showing that she had scattered or variable

concentration, struggled to maintain focus, and had a circumstantial or distractable thought process. Doc. No. 14, pp. 21-22.  But she also, at times, presented with normal concentration and/or thought process.  Tr. 737-738, 1048, 1414, 1312.  She reported to Biller that she avoided reading because her ADHD made it "almost impossible to concentrate," but she answered questions about material she read during her speech therapy session with 100% accuracy.  Tr. 1044-1045.  She references neuropsychological testing she had in 2014 (which is not in the record and which encompasses a time covered by the prior ALJ's decision) and asserts that Dr. Stevens had stated that that testing showed "frontal subcortical dysfunction which can have some long standing effects on development, lability, memory and attention deficits."  Doc. No. 14, pp. 21-22, Tr. 1127.  But Dr. Stevens did not opine that Paige had suffered effects of frontal subcortical dysfunction and Dr. Kuruvilla had opined that Paige's impairment was unlikely due to "any structural abnormalities of the brain."  Tr. 266.

Paige has not shown that the ALJ's RFC assessment is unsupported by the record.  "Even if the evidence could also support another conclusion," the ALJ's decision must stand if, as here, "the evidence could reasonably support the conclusion reached."  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–390 (6th Cir. 1999).

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

   **IT IS SO ORDERED.**

Date: January 19, 2022                      *s/ Jonathan Greenberg*
                                            Jonathan D. Greenberg
                                            United States Magistrate Judge

26